The Kirlin Company v. Commissioner.Kirlin Co. v. CommissionerDocket No. 93508.United States Tax CourtT.C. Memo 1964-260; 1964 Tax Ct. Memo LEXIS 81; 23 T.C.M. (CCH) 1580; T.C.M. (RIA) 64260; September 30, 1964*81 Petitioner accumulated its earnings and profits beyond the reasonable needs of its business during the year here involved and was availed of for the purpose of avoiding the income tax with respect to its shareholders. Secs. 531 through 537, I.R.C. 1954. Edgar W. Pugh, 3353 Penobscot Bldg., Detroit, Mich., and Albert Moehlman, for the petitioner. Robert W. Siegel, for the respondent. FISHERMemorandum Findings of Fact and Opinion FISHER, Judge: Respondent determined a deficiency in income tax against the above-named petitioner for its fiscal year ending August 31, 1958, in the amount of $103,439.33. The sole issue for decision is whether petitioner is subject to the tax imposed by section 531 of the 1954 Internal Revenue Code*83 , 1 on the ground that it was availed of during said fiscal year for the purpose of avoiding the income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed. Respondent also determined that a deduction for repairs in the amount of $456.70 should be disallowed, and an additional deduction for depreciation in the amount of $1,006.73 should be allowed. These adjustments, in the net amount of $286.02, reduce the deficiency in accumulated earnings tax from $103,725.35 to $103,439.33, the amount determined in the notice of deficiency. Petitioner claims an overpayment in income tax in the amount of $286.02. Respondent agrees that if the accumulated earnings tax issue is determined in favor of petitioner, it is entitled to an overpayment in income tax in the amount of $286.02. Findings of Fact Some of the facts have been stipulated and, together with the exhibits therein identified, are incorporated herein by reference. The Kirlin Company (hereinafter referred to as petitioner) is a corporation organized*84 under the laws of the State of Michigan with its principal office at 3435 East Jefferson, Detroit, Michigan. Petitioner timely filed its Federal income tax return for its fiscal year ended August 31, 1958, with the district director of internal revenue, Detroit, Michigan. Petitioner, incorporated on April 30, 1956, is a manufacturer of lighting fixtures. It is a continuation of a business previously operated as a co-partnership by the same name. Otis M. Kirlin, the father of Ivan M. Kirlin, started in the lighting business, electrical generating (public utility) in 1893. The Kirlin family has been in the business of manufacturing lighting fixtures continuously since 1895. In 1934, Ivan started in Detroit, Michigan, a continuance of the business previously operated by his father in St. Paul and Minneapolis. On July 31, 1944, a partnership agreement was entered into between Ivan, John A. Kirlin, Lillian A. Kirlin and Arleta L. Qualmann. The partnership agreement disclosed a partnership interest of 25 percent in each of the partners and the partnership was operated under the name of "The Kirlin Company." Lillian, John and On June 2, 1947, the above partnership was dissolved and*85 another partnership under the same name was formed. John, by bill of sale, received a 25 percent interest from Lillian. Ivan received a one percent interest from Arleta and a 26 percent interest from John. Walter Qualmann, husband of Arleta, received the remaining 24 percent from Arleta. The interest of the partners in this partnership was 52 percent to Ivan, 24 percent to John and 24 percent to Walter. The partners, on August 26, 1954, entered into an escrow agreement with a Detroit bank acting as escrow agent. Each partner executed and delivered to the escrow agent a bill of sale of all the individual partners' right, title and interest in and to the partners' business which he then owned and which he might thereafter acquire. The partners agreed that upon the death of one of the partners, the surviving partners would purchase, and the estate of the deceased partner would sell, the interest of the deceased partner on the company at a price determined, from the books and records of the company as of the end of the month in which the deceased partner's death occurred, to be the value of the deceased partner's capital account, adjusted for profit and loss as well as withdrawals. *86 This partnership was dissolved on April 30, 1956. The assets and liabilities of the partnership were allocated to two newly formed corporations, The Kirlin-Qualmann Company and petitioner. The trial balance of the partnership as of April 30, 1956, and the allocations of the newly formed corporations were as follows: AllocationPer TrialThe KirlinKirlin-QualmannItemBalance 4-30-56CompanyCompanyASSETSCash$ 203,242.96$203,242.96Petty Cash120.00120.00Accounts receivable159,445.02159,145.02Inventory358,421.97358,421.97Plant Account - net41,352.1241,352.12Furniture & Fixtures - net7,034.887,034.88Land - 3372 E. Larned2,022.00$ 2,022.003421 E. Jefferson4,500.004,500.003409 E. Jefferson9,900.009,900.00Apartment Bldg. - net8,520.948,520.94Factory Bldg. - net87,197.6587,197.65Office & factory - net149,020.49149,020.49Prepaid insurance570.02570.02$1,031,348.05$769,616.95$261,731.10LIABILITIESLiability to partners$601,322.56$211,731.10Accrued O.A.B. taxes$ 1,381.321,381.32Michigan E.C.C.425.15425.15Accrued commissions17,132.3317,132.33Accounts payable42,282.6042,282.60Union dues payable11.7511.75Withholding tax payable4,919.754,919.75Reserve for bad debts2,141.492,141.49Capital - I. M. Kirlin545,267.9152,000.0026,000.00J. A. Kirlin242,892.8924,000.0012,000.00W. Quaimann174,892.8624,000.0012,000.00$1,031,348.05$769,616.95$261,731.10*87 Upon dissolution of the partnership and transfer of the assets to the two newly organized corporations, the equity of the three partners in the partnership and the stock and notes received by the partners in the new corporations were as follows: ItemIvanJohnWalterEquity at time partnership dissolved$545,267.91$242,892.89$174,892.86Received for above equity: Stock of The Kirlin Company$ 52,000.00$ 24,000.00$ 24,000.00Note of The Kirlin Company357,167.74156,077.4288,077.40Stock of The Kirlin-Qualmann Company26,000.0012,000.0012,000.00Note of The Kirlin-Qualman Company110,100.1750,815.4750,815.46Total$545,267.91$242,892.89$174,892.86An agreement between Ivan, John and Walter for the sale of their stock in the event of the death of a stockholder to the remaining stockholders was entered into under date of May 1, 1956. The agreement further provided for the purchase by petitioner of that portion of the stock of a deceased stockholder which shall not be considered as a dividend to the estate of such decedent in accordance with section 303. From the date of organization through the year ended August 31, 1958, Ivan, *88 John and Walter owned 52,000, 24,000 and 24,000 shares, respectively, or 52 percent, 24 percent and 24 percent, respectively, of petitioner's outstanding stock. Until the death of Ivan in July 1962, the petitioner's board of directors consisted entirely of Ivan, John and Walter and the same men served as president, secretary-treasurer and vice-president, respectively, of petitioner. The notes in the amount of $601,322.56 issued by petitioner to Ivan, John and Walter were in exchange for assets of the predecessor partnership. These notes carried 4 1/2 percent interest payable in three years from the issue date, May 1, 1956. The notes were paid off by petitioner as follows: IvanJohnWalterTotal amount of$357,167.74$156,077.42$88,077.40noteDates Paid10-1-56$ 20,000.00$ 15,000.00$25,000.0012-27-566,000.002- 2-57150,000.0074,000.0063,077.404-30-57187,167.7461,077.42Total$357,167.74$156,077.42$88,077.40On June 26, 1956, the board of directors of petitioner approved the signing of a 5-year lease with Kirlin-Qualmann. Kirlin-Qualmann owned most of the real estate used by petitioner. The basis of the rental was*89 $3,000 per month plus all regular and special taxes that may be assessed on the property and with maintenance to be made by petitioner. The lease was to expire May 1, 1961. Ivan and Lillian each had an undivided one-half interest in one of the buildings used by petitioner. At the time of Ivan's divorce from Lillian, Ivan quitclaimed to Lillian an undivided interest in said property subject to a life estate reserved to and vested in Ivan, being the right to possess, use and enjoy the undivided one-half interest so conveyed to Lillian. After the divorce, during the life of Ivan, Lillian could in no way interfere with petitioner's occupancy of the real estate owned by her. Throughout petitioner's history and the history of the predecessor partnerships, its business has been highly profitable. Its net profits before taxes in all years since 1953 through the taxable year in issue always exceeded $500,000. For the taxable period May 1, 1956, to August 31, 1956, and the taxable year ended August 31, 1957, petitioner accumulated earnings in the amount of $410,942.24. No dividends were paid by petitioner during this period. In its taxable year ended August 31, 1958, petitioner earned approximately*90 $300,000 after taxes. No dividends were paid by petitioner. An analysis of surplus of petitioner for the period May 1, 1956, to August 31, 1962, is as follows: SurplusDebitCreditBalanceBalance May 1, 1956 (Inception date)0Income for period 5-1 to 8-31-56$119,492.56Federal income taxes, period ended$ 56,636.138-31-56Balance, August 31, 1956$ 62,856.43Income for year ended 8-31-57$713,720.44Federal income taxes, year ended$365,634.638-31-57Balance, August 31, 1957$410,942.24Income for year ended 8-31-58$611,590.96Nontaxable interest income3,791.68Federal income taxes, year ended$312,527.308-31-58Unallowable excess of capital lossesover capi-tal gains, year ended 8-31-58811.74Balance, August 31, 1958$712,985.84Income year ended 8-31-59$360,500.22Federal income taxes, year ended$180,400.838-31-59Nontaxable interest income2,058.33Revenue Agent's adjustments for yearsended8-31-56 and 8-31-578,094.09Unallowable excess of capital lossesover capi-tal gains, year ended 8-31-59143.04Deficiency in Federal income taxes foryearsended 8-31-56 and 8-31-574,357.18Dividends paid100,000.00Balance, August 31, 1959$798,737.43Income, year ended 8-31-60$232,109.99Unused capital loss carryover from8-31-58 andyears ended8-31-59954.78Federal income taxes, year ended$104,831.688-31-60Revenue Agent's adjustments, year286.02ended 8-31-58Dividends paid200,000.00Balance, August 31, 1960$726,684.50Income, year ended 8-31-61$342,083.74Federal income taxes, year ended$172,276.368-31-61To reserve for replacements, etc.195,000.00Dividends paid100,000.00Balance, August 31, 1961$601,491.88Income, year ended 8-31-62$ 51,981.60Nominal value of patent1.00Federal income taxes year ended$ 13,722.108-31-62Rev. Agts. adjustments, yr. ended2,808.008-31-60Balance, August 31, 1962$636,944.38*91 A comparative balance sheet of petitioner for its taxable years ended August 31, 1957, through August 31, 1959, and for the taxable period May 1, 1956, to August 31, 1956, is as follows: THE KIRLIN COMPANYCOMPARATIVE BALANCE SHEETS8-31-56August 31 4 Mo. 1956195719581959Cash$326,906.91$ 318,248.66$ 372,705.28$ 305,145.17Securities: Mich. Trunk Line200,523.61BondsU.S. Treas. NotesAccruedInt. Investments149,370.24Accts. Rec. - Net233,868.43211,804.19193,944.02174,836.03of reserveAccts. Rec. - Other292,683.98306,301.94298,574.47309,691.65InventoryPrepayments280.86822.14CURRENT ASSETS$853,740.18$ 837,176.93$1,065,747.38$1,098,629.95PROP. PLANT & EQPT.$124,137.06$ 140,380.28$ 138,352.33$ 160,833.01Less: Res. for Dep.(84,680.81)(94,263.84)(101,622.18)(114,786.07)Furn. & Fixtures12,132.4913,438.5214,302.8214,764.55Less: Res. for Dep.(5,344.68)(6,552.42)(7,387.06)(8,806.20)Prepayments1,151.111,319.88TOTAL ASSETS$899,984.24$ 890,179.47$1,110,544.40$1,151,955.12Accounts Payable$ 48,271.07$ 32,490.47$ 14,040.74$ 90,491.11Commissions Payable25,007.7627,612.1319,242.1216,728.04Payroll and Other5,890.295,898.406,956.55TaxNotes Payable -601,322.56OfficersFed. Income Taxes56,636.13319,134.63258,377.30139,041.99CURRENT LIABILITIES$737,127.81$ 379,237.23$ 297,558.56$ 253,217.69STOCKHOLDERS'EQUITYCapital Stock100,000.00100,000.00100,000.00100,000.00Retained Earnings62,856.43410,942.24712,985.84798,737.43TOTAL LIABILITIES$899,984.24$ 890,179.47$1,110,544.40$1,151,955.12*92 A comparative earnings statement of petitioner for its taxable years ended August 31, 1957, through August 31, 1959, and for the taxable period May 1, 1956, to August 31, 1956, is as follows: THE KIRLIN COMPANYCOMPARATIVE EARNINGS SUMMARY5/1 to 8/31 4 Mo. 1956195719581959Sales$856,393.63$2,355,398.30$2,048,270.57$1,865.843.42Cost of Sales357,305.66532,229.75445,530.21591,073.57Gross Profit on Sales$499,087.97$1,823,168.55$1,602,740.36$1,274,769.85Discount Earned andOtherIncome3,126.275,129.545,188.404,752.60$502,214.24$1,828,298.09$1,607,928.76$1,283,050.25Salaries and Wages$112,110.47$ 318,890.00$ 289,287.60$ 280,040.39Officers (Partners)38,000.00115,890.00120,480.00120,480.00SalariesCommissions Paid84,440.64229,853.90201,657.83183,293.01Depreciation allowance3,888.9310,790.7710,923.5613,203.05All other Expenses144,281.64439,152.98371,008.90323,618.29Total Expenses$382,721.68$1,114,577.65$ 993,357.86$ 920,634.74NET PROFIT BEFORETAXES$119,492.56$ 713,720.44$ 614,570.90$ 362,415.51On November 22, 1957, petitioner*93 purchased $250,000 face value Commonwealth of Pennsylvania Tax Notes for $251,395.06, which amount included $583.32 accrued interest. These bonds were redeemed on May 29, 1958, for $250,000 plus accrued interest of $4,375. Petitioner, on June 6, 1958, purchased State of Michigan Trunk Line Revenue Bonds, in the face amount of $200,000 for $200,523.61, which amount included accrued interest of $523.61. These bonds were sold on October 22, 1958, for $183,601.94, which amount included accrued interest of $2,581.94. Petitioner purchased and sold the following stocks in the fiscal years ended August 31, 1958, and 1959: SellingGain orNAMEAcquiredSoldCostPrice(Loss)Eastman Kodak -11-11-588-14-59$ 28,055.96$ 35,552.22$ 7,496.26200 sharesU.S. Gypsum - 20011-12-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,497.4021,083.891,586.49sharesCorning - 2005-15-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,403.3028,073.952,670.65sharesCorning - 2006-11-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,553.4627,774.372,220.91sharesSears Roebuck &11-11-589-15-597,198.629,700.882,502.26CompanyUnion Carbide11-11-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,102.0026,601.052,499.05International11-11-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,625.0061,951.6317,326.63Business MachinesInternational11-12-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,402.3025,065.55663.25PaperFord11-12-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,213.1215,267.155,054.03Allied Chemical11-12-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,097.0021,732.992,635.99Chrysler12-12-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,949.8825,653.765,703.88Sunbeam11-11-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,239.1612,296.391,057.23General Motors4-13-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,872.2654,591.747,719.48Bendix5-15-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,545.4613,594.58(3,950.88)Totals$323,754.92$378,940.15$55,185.23*94 All stocks and bonds purchased by petitioner were paid for in full by cash and were not purchased on margin. Petitioner paid its 1958 income tax liability in three installments on or about the following dates: DateAmountMay 14, 1958$ 54,150.00Nov. 21, 1958129,188.65Feb. 10, 1959129,188.65The Underwriters Laboratories, Inc., sponsored by the National Board of Fire Underwriters, is chartered as a nonprofit organization to establish, maintain and operate laboratories for the examination and testing of devices, systems and materials. Petitioner subscribed to the label services offered by Underwriters. Petitioner would submit its product or sketches of it to Underwriters' engineers who decided whether the product complied with the standard as printed or if there were features that would demand a test. If a test was needed, the product was tested by the engineers. Petitioner was inspected periodically by Underwriters' inspectors who determined if the manufactured products met petitioner's specifications and Underwriters' requirements. If the products met these requirements, then petitioner was permitted to affix Underwriters' label to the products. The*95 same specifications and the same test results were required to be met by all manufacturers. A change in Underwriters' standards would affect all manufacturers. During the taxable year ended August 31, 1958, the principal lighting fixtures manufactured by petitioner were recessed lighting fixtures. Petitioner held basic patents, taken out in 1953, on features of its recessed lighting fixtures. Said fixtures were brought on to the market in 1949, prior to petitioner receiving patents. Since 1955 petitioner has had to make numerous changes in its products to comply with Underwriters' requirements. For instance, a die to eliminate burrs or sharpen edges on the outlet box produced by petitioner, costing approximately $6,000, was completed early in 1963. The work on that die was started during the summer of 1962. Underwriters also objected to the size and number of louvers in the 300, 1208, 1211 and 1212 fixtures. Petitioner expended about $80,000 over a period of approximately 2 1/2 years to make the necessary changes. That amount includes labor, engineering and development expenses. In 1953 or 1954 petitioner envisioned a less expensive recessed lighting fixture than had previously*96 been possible to produce and bear the Underwriters' label. The development was made possible because of changes in the requirements of Underwriters. The project was referred to by petitioner as "Model 88." Ivan and John were active in the research and development of Model 88 which would sell for one-half the price of petitioner's lowest priced model. It had not, at the time of trial, reached the market. So far petitioner's expenditures on the development of Model 88 are in excess of $100,000. Two presses costing $74,000 were purchased to produce the fixture. Another $10,000 was spent to accommodate the presses installed in June 1962. Petitioner estimates it will need one more press to produce the fixture and that the total cost for the development of Model 88 will be in excess of $200,000 and may be as high as a quarter of a million dollars. Petitioner has no account set up to amortize research expenditures. No deduction of expenses was taken on petitioner's tax returns for amortization of research expenditures. All research expenses were changed to current operations. In 1956, petitioner negotiated with the Wakefield Company of Vermillion, Ohio, about the possibility of the*97 two companies jointly forming a Canadian company to manufacture and distribute lighting fixtures. Petitioner sent its check to Wakefield on September 27, 1956, in the amount of $5,000 as a preliminary step. The projected cost to petitioner was $65,000. These negotiations were terminated on October 31, 1956, and petitioner's check in the amount of $5,000 was returned. Petitioner, in 1957, held discussions with J. A. Wilson Company, Ltd., Toronto, Canada, concerning the expansion to Canada. No specific plans were ever formulated with Wilson. Discussion was held with a few other companies, but at no time did petitioner discuss or negotiate with any other company regarding expansion or diversification to an extent greater than its negotiations with Wilson or Wakefield. Petitioner did not employ any salesmen other than a sales manager. Its sales staff is composed of representatives selling on a commission basis throughout the country. Petitioner circulates a catalogue which is in part loose-leaf and in part booklet form. The loose-leaf part is amended by either removing or inserting sheets. The basic catalogue, in booklet form, is amended by pasting in small pink slips showing major*98 changes to the products listed. Minor changes are never noted in the catalogue. It is the responsibility of the manufacturers' representative representing petitioner to keep the catalogues up-dated. The catalogue presently in use was put out in late 1959 or early 1960. The complete cost of said catalogue was $40,000. In 1958 petitioner carried insurance on the contents of the buildings it used in the amount of $112,000 basic insurance. Petitioner was self insured as to the balance of its contents, approximately $400,000. Insurance coverage was increased in 1960. Petitioner never carried any product liability insurance which would protect it from damages caused by the faulty performance of one of its products. Petitioner has never paid out a substantial claim for product liability. It has, from time to time, replaced clothing, desk tops and lighting fixtures, the total cost of which was less than $10,000 as of the time of trial. In 1958 petitioner had an appraisal made to ascertain the cost of replacing its equipment. The appraisers estimated replacement cost at $1,172,448.70. The total book value of the equipment at August 31, 1958, was $138,352.33, less reserve for depreciation*99 of $101,622.18, or net book value of $36,730.15. Petitioner in 1958 did not seriously consider moving out of Detroit. The cost of moving its plant in 1958 was a substantial deterrent. Assuming petitioner would have moved its plant in 1958, it would have moved most or all of its equipment rather than replace it. A schedule of expenditures by petitioner for building renovation and machinery for the fiscal years ending August 31, 1959, through 1962 is as follows: FiscalExpendituresYearBuildingEndedRenovationMachinery8/31/59$ 2,162.50$ 9,474.078/31/6012,921.4834,311.748/31/614,079.0817,990.298/31/626,357.3380,505.61Petitioner employed approximately 50 production employees in 1958. Said employees are represented by the International Brotherhood of Electrical Workers Local 58. All wage rates pertaining to petitioner are negotiated by representatives of the union and petitioner. The local union has no influence over and is not influenced by rates paid in any area outside its local jurisdiction. Petitioner's labor rates were higher than the rates of any other electrical fixtures manufacturer in the United States, with the exception*100 of the New York City area. From 1955 through 1962 there has never been an authorized strike at petitioner. There was a wildcat strike in 1956. A wildcat strike also occurred in 1957. There was a threatened strike in 1958 which was averted by economic concessions. There was a strike begun on March 1, 1963, which was still in progress at time of trial. A meeting of the board of directors was held on July 16, 1958. The corporate minutes of that meeting read, in part, as follows: In consideration of * * * the fact that we have insufficient funds available without borrowing, it was decided that no dividends should be paid at this time due to the need for working capital as outlined herein. It was decided that no increases will be made at this time in salaries of officers, nor any bonsuses be paid to officers for this fiscal year * * *. Under date of July 18, 1958, Edgar W. Pugh, petitioner's counsel, sent a letter to Ivan, which reads, in part, as follows: I certainly agree with you that it would not be a good policy for the corporation, due to its financial position, to pay dividends at this time, especially when funds would have to be borrowed in view of the need for capital concerning*101 expansion. A meeting of the stockholders, followed by a meeting of the board of directors of petitioner, was held on August 12, 1958. The minutes of the meeting state: It had previously been determined, upon advice from the tax attorney Edgar Pugh, that there would not be sufficient funds to make the planned improvements and also to pay a dividend, hence no dividend for the year could be declared at this time. * * * Petitioner has received advice from its tax counsel since its incorporation. Respondent's agent began his examination of petitioner on June 18, 1959. The agent first discussed the accumulation of earnings issue with petitioner's accountant on July 30, 1959. At a meeting of petitioner's stockholders, followed by a meeting of its board of directors on August 11, 1959, it was decided that a dividend of $100,000 could be paid for the year ended August 31, 1959. At a meeting of petitioner's board of directors held on August 9, 1960, it was determined that petitioner would pay four quarterly dividends of 25 cents per share. This would amount to $100,000. On August 8, 1961, petitioner's board of directors declared four quarterly dividends of 25 cents per share be paid, *102 amounting to $100,000. By letter dated December 9, 1960, respondent notified petitioner in accordance with the provisions of section 534 that it proposed to issue a statutory notice of deficiency for the year ended August 31, 1958, which included an amount with respect to the accumulated earnings tax imposed by section 531. On January 24, 1961, petitioner filed with respondent a statement of grounds (together with the facts showing the basis thereof) on which it relied to establish that no part of its earnings and profits had been permitted to accumulate beyond a reasonable need of the business. Ivan, John and Walter received compensation from petitioner during its taxable year ended August 31, 1958, in the amounts of $60,000, $42,000 and $18,480, respectively. The taxable income of Ivan as shown on his Federal income tax return for the taxable year 1958 was $49,026.90. Any additional income received by Ivan for that taxable year would have been taxed at a starting rate of 59 percent. The taxable income of John as shown on his Federal income tax return for the taxable year 1958 was $43,062.14. Any additional income received by John for that taxable year would have been taxed*103 at a starting rate of 56 percent. Petitioner during its taxable year ended August 31, 1958, was availed of for the purpose of avoiding the income tax with respect to its shareholders by permitting earnings and profits to accumulate beyond its reasonable needs, including its reasonably anticipated needs for said year, instead of being distributed. Petitioner's accumulated taxable income for its taxable year August 31, 1958, was $297,987.91. Opinion The sole issue in this case is whether petitioner corporation is subject to the accumulated earnings tax. Sections 531 and 532 impose an additional tax designated as an accumulated earnings tax upon a corporation formed or availed of for the purpose of avoiding the income tax with respect to its shareholders by permitting earnings and profits to accumulate instead of being divided or distributed. Section 533 provides that the fact that earnings and profits are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the above-mentioned purpose, unless the corporation by the preponderance of the evidence shall prove to the contrary. Section 534 then provides that, when the Commissioner notifies*104 a taxpayer corporation of his intention to issue a notice of deficiency imposing the accumulated earnings tax, the corporation, in response to such notice, may submit a statement of the relevant grounds (together with facts sufficient to show the basis thereof) on which it relies to establish that all or any part of the earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business. The burden of proof with respect to whether the accumulation actually was beyond the reasonable needs of the business shall then be on the Commissioner with respect to the grounds set forth in the taxpayer corporation's statement. Section 535(c) contains authority for allowing an accumulated earnings credit in an amount equal to such part of the earnings and profits for the taxable year as are retained for the reasonable needs of the business. Section 537 states that the term "reasonable needs of the business" includes the reasonably anticipated needs of the business. In the instant case, respondent did send a notification to petitioner in accordance with the provisions of section 534 and petitioner filed its statement in response thereto. After a careful reading*105 of petitioner's statement, we conclude that it does suffice to meet the general purpose and intent of the statute and thereby shifts the burden of proof to respondent with respect to the grounds alleged therein. The ultimate burden of proving that petitioner was not availed of for the prohibited statutory purpose, however, is and remains upon petitioner. Pelton Steel Casting Co., 28 T.C. 153 (1957), affd. 251 F. 2d 298 (C.A. 7, 1958), certiorari denied 356 U.S. 958 (1958). In our analysis of the case, we must inquire into the reasonably anticipated needs of the business, whether the accumulated earnings and profits of prior years are in an amount sufficient to cover those needs and, if the prior years earnings and profits are sufficient in amount, did petitioner have enough liquid assets to meet the reasonable needs and still permit a distribution as a dividend to its shareholders. Sauk Investment Co., 34 B.T.A. 732 (1936); Gus Blass Co., 9 T.C. 15 (1947). The ascertainment of the reasonable needs of a corporation is in the first instance a task for the officers and directors of the corporation. Courts should be*106 hesitant to attribute an ulterior motive to the corporation, unless it is clearly warranted by the facts and circumstances surrounding the questioned accumulation of earnings and profits. Crawford County Printing & Publishing Co., 17 T.C. 1404 (1952); Breitfeller Sales, Inc., 28 T.C. 1164 (1957). We think it is quite clear that petitioner did not reasonably need amounts in excess of the accumulated earnings and profits available to it at the beginning of the taxable year under consideration. In this connection, we turn to a consideration of the grounds asserted by petitioner and of the evidence pertinent thereto, bearing in mind that whether a corporation was availed of for the purpose of avoiding the income tax with respect to its shareholders and whether earnings and profits were permitted to accumulate beyond the reasonable needs of the business are both questions of fact. This being so, we shall not enumerate and analyze the numerous cases involving these issues for each case rests on its own peculiar facts and circumstances. Olin Corporation v. Commissioner, 128 F. 2d 185 (C.A. 7, 1942), affirming 42 B.T.A. 1203 (1940); *107 James M. Pierce Corporation, 38 T.C. 643 (1962); J. Gordon Turnbull, Inc., 41 T.C. 358 (1963) (On appeal, C.A. 6, Sept. 16, 1964). It is to be noted that petitioner in its statement of grounds, dated January 24, 1961, made no claims or suggested allocations of specific or estimated amounts to be required and accumulated for the reasonable needs of the business in the respects of the several grounds presented in the statement. Petitioner first alleges as a ground for retention of its earnings and profits its desire to have funds available for paying its fiscal 1958 income taxes when they became due. Petitioner states that instead of leaving the funds in a commercial bank, the necessary funds were invested in bonds and stocks and held until such time as the taxes were due. However, petitioner always had on hand sufficient cash to pay its income tax liability even after the bonds were purchased. The bonds and stocks were never resorted to by petitioner as a means of paying its income tax liability. As soon as the Commonwealth of Pennsylvania Tax Notes were redeemed, petitioner reinvested substantially all of the proceeds in State of Michigan Trunk Line Revenue*108 Bonds. Interest received from both these investments was tax-free. After sustaining a loss upon the sale of the State of Michigan Trunk Line Revenue Bonds, the proceeds were reinvested in corporate common stocks. Retention of funds for investment speculation is not contemplated by section 537 as being for the reasonable needs of the business. Petitioner argues that it needed funds to comply with requirements of Underwriters so that its products would have the Underwriters' label of approval. The record establishes that petitioner's need of funds for this purpose did not exceed $25,000 per year. Petitioner next argues that it needed funds to protect against liability for damage suits as a manufacturer. Since 1950, neither petitioner nor its predecessor has paid out in cash a liability claim for damages, and the total expenses during that period relating to product liability was less than $10,000. Petitioner's products were always installed by others, usually electrical contractors. Petitioner's past experience and the likelihood that any damage resulting would arise from faulty installation rather than from a defective fixture, and thus be the risk of the contractor rather than*109 petitioner, confirm respondent's position that no substantial funds were needed for protection against any liability for damages as a manufacturer. Petitioner argues it needed funds to expand its operations into Canada. As of August 31, 1958, petitioner had no specific plans for such expansion. All negotiations with the Wakefield Company and the J. S. Wilson Company, Ltd., had terminated prior to the taxable year at issue. A corporation's earnings and profits may be accumulated for the purpose of expansion and modernization. Such need, however, must be supported by substantial, material, and definite facts along with clear and specific plans. American Metal Products Corp., 34 T.C. 89 (1960), affd. 287 F. 2d 860 (C.A. 8, 1961). Accordingly, petitioner had no reasonable need for funds for this purpose as of August 31, 1958. The next assertion of petitioner as to why it needed to accumulate earnings and profits is a need for a new site for the operation of its business. Lillian and Ivan were divorced and Lillian received an undivided one-half interest in one of the buildings used by petitioner, subject to a life estate reserved to and vested in Ivan. The*110 other buildings used by petitioner were owned by the Kirlin-Qualmann Corporation, the stock of which was owned by the petitioner's shareholders. Petitioner argues that upon the death of Ivan "it is quite probable that no agreement can be reached [with Lillian] whereby the corporation could remain as a tenant and it would be necessary to obtain a new site." The surviving shareholders of petitioner in the event of the death of Ivan would be Lillian's son and son-in-law. No friction existed between Lillian, John and Walter and it is improbable that petitioner would have any difficulty in negotiating a lease with Lillian. Petitioner also argues that in 1958 it considered the probability of moving its plant out of the city of Detroit and that it needed funds for that purpose. The principal reason given for considering the move was the labor situation. It is unreasonable to assume that petitioner's shareholders would vacate property owned by them. Furthermore, there is nothing in the record to indicate that definite, material plans were formulated to carry out any proposed move. American Metal Products Company, supra.Therefore, no funds were needed, at this time, for a*111 new site in which to operate the business. Petitioner next alleges a need for funds to replace its equipment. It states that its sales were decreasing and concludes therefrom that in order to offset the decrease, new machinery, equipment, tools and dies must be installed. An appraisal was made whereby petitioner was advised that the replacement cost of its machinery, equipment, tools and dies would amount to $1,172,448. Petitioner then states that its assets were so old that it was not economically sound to continue to operate unless a large part of the assets should be replaced. Petitioner's president, however, testified that most of the equipment would be moved rather than replaced if petitioner should relocate. Furthermore, the evidence shows that petitioner's total expenditures for machinery and equipment for the taxable years ended August 31, 1959, through August 31, 1962, were $142,281.71, of which approximately $74,000 was expended for presses to produce Model 88. These facts indicate that there was no real anticipated need as of August 31, 1958, for petitioner to replace a major portion of its assets. Petitioner cites the wage differential of competitors as a ground for*112 accumulation of earnings. This, by itself, does not indicate a need for funds. One has only to look at petitioner's earnings statement to see that its net profit before taxes for the years ended August 31, 1957, and 1958, exceeded 30 percent of sales. This is clearly an excellent profit margin regardless of the wage rate. Petitioner states that it was in excess of $1,000,000 short of funds for known and projected needs as of August 31, 1958. No facts or even general allocations were set forth in the 534(c) statement to support this contention. It is further argued by petitioner that it should be permitted to accumulate funds to meet operating expenses for at least one year. With respect to this argument, it should be pointed out that there is no showing by petitioner as to what its average annual operating funds were. The amount of $1,436,451.42 set forth in the 534(c) statement is petitioner's cost of sales, plus total expenses for its taxable year ended August 31, 1958. In F. E. Watkins Motor Co., Inc., 31 T.C. 288 (1958), cited by petitioner, the record contained evidence of that taxpayer's average operating funds. The average yearly operating funds were substantially*113 less than the cost of sales and total expenses for the years involved. In Barrow Mfg. Co., Inc. v. Commissioner, 294 F. 2d 79 (C.A. 5, 1961), certiorari denied 369 U.S. 817 (1962), the court rejected the argument that the taxpayer was entitled to a sufficient amount of cash to cover one year's operating expenses and stated "with petitioner a rapid turnover of inventory and quick and almost certain collection of accounts provided most of the operating funds." In the instant case petitioner's sales during the year in issue exceeded $2,000,000 and its inventory fluctuated between $300,000 and $350,000. This is evidence of a rapid turnover of inventory. In view of this factor and petitioner's insignificant bad debt losses, it can be said that it, like the taxpayer in Barrow Mfg. Co., Inc., supra, received quick and almost certain collection of accounts which provide most of its operating funds. Petitioner argues that it was necessary for it to accumulate its earnnings and profits in 1958 in order to permit it to redeem shares of stock from the estate of a deceased shareholder in accordance with the provisions of section 303. We do not consider*114 this an acceptable ground for the accumulation of petitioner's earnings and profits in 1958. Youngs Rubber Corporation v. Commissioner, 331 F. 2d 12 (C.A. 2, 1964), affirming a Memorandum Opinion of this Court. Petitioner loses sight of the requirement that the accumulation must be for the reasonable needs of its business, and not to provide the estate of its majority stockholder with sufficient funds to meet the various estate taxes and other expenses. Petitioner, since its section 534(c) statement, has advanced one additional ground for accumulation of earnings - its need for funds for Model 88, a new low cost fixture being developed. The idea for this fixture was first discussed back in 1953 or 1954. The evidence most favorable to petitioner is that it would need in excess of $200,000 to be able to put the Model 88 on the market. It was not until 1962 that petitioner first purchased machinery that would eventually be used to manufacture this item. Of the $200,000 estimated by petitioner as being needed for this project, only an approximate amount of $120,000, representing cost of new machinery, was other than normal operating costs. The remainder, to be spent for*115 research and development, was part of petitioner's normal operating expenses which are charged against income annually. Nonetheless, even assuming petitioner had a genuine need for $200,000 for this project on August 31, 1958, its prior accumulated earnings in the amount of $410,942.24, were more than sufficient to cover this need as well as all other reasonably anticipated needs. Under the caption "Current Operating Need for Funds," petitioner, in its statement, sets forth an arithmetical computation which shows a potential cash deficit had all earnings been distributed as urged by respondent. Petitioner's computation is as follows: Liquid assets on hand 8-31-58 (excluding accountsreceivable andinventories)$557,705.28Less: Loss on transfer of Michigan bonds16,921.67$540,783.61[Demands] against cash during fiscal year ended8-31-59 that werereasonably certain: Federal income taxes258,377.30Taxes and commissions25,140.52Known seasonal increase in inventory150,000.00433,517.82$107,265.79Additional dividends urged by Commissioner297,701.89Potential cash deficit had all earnings been($190,436.10)distributed*116 Using the same formula with certain changes added to properly reflect petitioner's cash as determined by the evidence, a surplus is realized as follows: Cash and securities on hand (as shown by the$573,228.89balance sheet)Less: Loss on transfer of Michigan bonds16,921.67Plus: Accounts receivable - net of reserve193,944.02Total$750,251.24Demands against cash during fiscal year ended8-31-59 that werereasonably certain: Federal income taxes$258,377.30Taxes and commissions25,140.52Known seasonal increase in inventory60,000.00$343,517.82Total$406,733.42Additional dividends urged by respondent$297,987.91Potential cash surplus had all earnings been$108,745.51distributedThe liquid assets on hand were increased to reflect the amount as shown on the balance sheet. The seasonal increase in inventories was reduced to $60,000 to reflect the actual increase as shown by the evidence. Petitioner's inventories as of August 31, 1958, were $298,574.47. Its average inventories based on the inventories as of August 31, 1956, 1957, 1958 and 1959 were $301,813.01. By petitioner's own computation, its peak month in inventory*117 was in the spring of 1958, prior to the July vacation period. Petitioner's inventory at that time was $353,620. Based upon such evidence, an allowance of $60,000 for known seasonal increase in inventory is adequate. The net accounts receivable of $193,944.02 have been added because they represent liquid assets. Petitioner's bad debt losses were negligible. Petitioner, as of August 31, 1958, had every reason to believe that substantially all of the receivables would have been paid during the ensuing fiscal year. The resulting surplus in cash as of August 31, 1958, in the amount of $108,745.51 was more than sufficient to meet petitioner's reasonably anticipated needs. Furthermore, petitioner, during its fiscal year ended August 31, 1957, paid off notes in the amount of $601,322.56 which were issued to its three stockholders, Ivan, John and Walter. These notes were not due until May 1, 1959. By paying off these notes petitioner clearly demonstrated at that time that its cash position was adequate to meet its reasonably anticipated needs. We have found that petitioner accumulated its earnings and profits for its taxable year ended August 31, 1958, beyond the reasonable needs of its*118 business as of that date. This fact is determinative of the purpose to avoid the income tax with respect to its shareholders in view of the absence of proof to the contrary by a preponderance of the evidence. Section 533. Moreover, no evidence has been produced as to the nonexistence of the prohibited motive. Petitioner has thus also failed to meet its burden of proof on this ultimate issue. Under all of the circumstances, we hold for respondent on the contested issues. Decision will be entered under Rule 50. Footnotes1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended.↩